# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

| | |
|---|---|
| KIM CHISM, | ) |
| | ) |
|       Plaintiff, | ) |
| | ) |
| v. | )     Cause No.: 3:08-CV-387 |
| | ) |
| CON-WAY FREIGHT, INC., | ) |
| | ) |
|       Defendant. | ) |

## MEMORANDUM OF OPINION AND ORDER

This matter is before the court on the motion for summary judgment filed by the

defendant, Con-way Freight, Inc. ("Con-way") on June 12, 2009. Docket at 30. Con-way also

filed a Brief in Support of Defendant's Motion for Summary Judgment ("Defendant's Brief").

Docket at 31. Plaintiff Kim Chism ("Chism") filed Plaintiff's Response in Opposition to

Summary Judgment ("Plaintiff's Response") on August 12, 2009. Docket at 34. Con-way filed

Defendant's Reply to Plaintiff's Response in Opposition to Summary Judgment ("Defendant's

Reply") on August 21, 2009. Docket at 36. For the reasons discussed below, the motion for

summary judgment is GRANTED.

## FACTUAL BACKGROUND

Chism filed this action on August 22, 2008, alleging that Con-way violated her rights

under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title

VII"); 42 U.S.C. § 1981 ("Section 1981"); and the Family and Medical Leave Act, 29 U.S.C. §

2601, *et seq.* ("FMLA"). Complaint, docket at 1, p. 1. In her Complaint, Chism states that she is

an African-American who was employed by Con-way from 1999 until August, 2007, when she

was terminated. *Id.*, p. 2. Chism states that prior to her discharge she was working as a

Customer Service Representative or "CSR" and that "[a]t all times relevant to this action, Chism met Con-way's legitimate employment expectations." *Id.* On November 20, 2006, Chism filed a charge of discrimination with the South Bend Human Rights Commission ("SBHRC") and the Equal Employment Opportunity Commission ("EEOC"), alleging that she was the victim of racial discrimination. *Id.* Chism states that in February of 2007 she submitted to Con-way "the necessary paperwork to obtain FMLA leave to care for her mother, who was diagnosed with cancer." *Id.*, p. 3.

Chism alleges that, in addition to her allegations of race discrimination as set forth in her SBHRC and EEOC charge, Con-way retaliated against her for having filed the charge in the first instance. *Id.* Chism alleges that on May 4, 2007, she received an unfair performance review; on May 8, 2007, she was unfairly reprimanded in front of coworkers; and that shortly thereafter she "was subjected to a loud verbal scolding by manager Karl Cushey." *Id.* Also on May 8, shortly after the "scolding" by a manager, Chism received a phone call from her mother who requested a ride to a doctor's appointment. *Id.* Chism left work and took her mother to the doctor, then called Con-way that evening to report that she "was going to use her FMLA leave to care for her [mother] and was not sure when she would be able to return to work." *Id.* She called the company the next day, also, to confirm her call the day before. *Id.* On May 10, 2007, Chism called Con-way in the afternoon and informed the company that she would be unable to return to work until Monday, May 14, 2007, as she needed additional time to care for her mother. *Id.*

On May 15, 2007, Chism received a written discipline notice from Con-way titled a "Letter of Instruction" "for allegedly failing to advise Con-way that she would not be at work on May 10th." *Id.*, p. 4. On May 25, Chism was given a second Letter of Instruction, this time

allegedly as the result of "a verbal altercation initiated by another employee while Chism was

eating lunch at her desk on May 18, 2007." *Id*. Chism received a third such letter on June 15

reprimanding her "for alleged rudeness to customers and Con-way employees on the telephone."

*Id*. On July 26, Chism received yet another warning about her alleged "'intimidating' behavior

toward other employees. Chism was told by Cushey that she was not to look at other employees

because she 'intimidated' them." *Id*. Chism claims that "[o]n July 27 and July 30, 2007, Con-

way transferred major portions of Chism's duties to other employees." *Id*. On August 2, 2007,

Chism met with Greg Pawelski, Con-way's Human Resource Director, to discuss the alleged

"intimidation" Chism displayed in the workplace. *Id*. Chism states that "later that day, [she]

spoke with some of her co-workers in an effort to determine how she might have 'intimidated'

them." *Id*. The next day, Chism was terminated, allegedly "because she was 'intimidating' other

employees by the way she was looking at them." *Id*. Chism claims that prior to her termination,

she repeatedly asked for permission to begin work early so she could leave early to care for her

mother. *Id*. Chism states that her requests were denied, even though Con-way had allowed other

employees to adjust their work hours. *Id*. Finally, Chism states that shortly before she was

terminated from her job, she "was informed by co-workers that they had been instructed by Con-

way's management not to look at or talk to [her]." *Id*., p. 5.

Chism alleges in Count One of her Complaint that Con-way retaliated against her in

violation of Title VII for having filed a charge of discrimination. *Id*. She alleges in Count Two

that Con-way violated her rights in violation of the FMLA. *Id*.; She alleges in Count Three that

she was the victim of race discrimination in violation of Section 1981. *Id*.; and she alleges in

Count Four that Con-way retaliated against her in violation of Section 1981. *Id*., pp. 5-6. By

way of her Complaint, Chism is seeking compensatory, liquidated, and punitive damages; prejudgment and postjudgment interest; attorney fees and costs; and all other relief to which she may be entitled for the alleged violations by Con-way.

Con-way, of course, takes issue with Chism's version of the facts. Defendant's Brief, p. 1. Con-way claims that it had approved every request for FMLA leave it ever received from Chism and that following each leave period, she was permitted to return to her same job with her same level of pay. *Id.* Con-way also alleges that before the decision was made to terminated Chism, the company had "received multiple complaints from customers and employees regarding Plaintiff's rude, intimidating and obstructive behavior." *Id.* Con-way claims that Chism was counseled and repeatedly warned about her allegedly improper behavior in the workplace, but that Chism continued to engage in such conduct. *Id.* Con-way claims that its Human Resources Director, Greg Pawelski finally warned Chism that she should "immediately cease such conduct, [but] she mocked those warnings, and, as a consequence, was terminated." *Id.* Con-way argues that Chism's termination had nothing to do with race discrimination, retaliation, or the FMLA. *Id.*, pp. 1-2. Con-way seeks summary judgment in its favor on all of Chism's claims. Motion for Summary Judgment, docket at 30.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the record shows that there is "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56©; *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). Disputes concerning material facts are genuine where the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In

deciding whether genuine issues of material fact exist, the court construes all facts in a light most favorable to the non-moving party and draws all reasonable inferences in favor of the non-moving party. *See id.* at 255. However, neither the "mere existence of some alleged factual dispute between the parties," *id.,* 477 U.S. at 247, nor the existence of "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986), will defeat a motion for summary judgment. *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir. 2000).

Summary judgment is not a substitute for a trial on the merits nor is it a vehicle for resolving factual disputes. *Waldridge v. Am. Hoechst Corp.,* 24 F.3d 918, 920 (7th Cir. 1994). Therefore, after drawing all reasonable inferences from the facts in favor of the non-movant, if genuine doubts remain and a reasonable fact-finder could find for the party opposing the motion, summary judgment is inappropriate. *See Shields Enterprises, Inc. v. First Chicago Corp.,* 975 F.2d 1290, 1294 (7th Cir. 1992); *Wolf v. City of Fitchburg,* 870 F.2d 1327, 1330 (7th Cir. 1989). But if it is clear that a plaintiff will be unable to satisfy the legal requirements necessary to establish his or her case, summary judgment is not only appropriate, but mandated. *See Celotex,* 477 U.S. at 322; *Ziliak v. AstraZeneca LP,* 324 F.3d 518, 520 (7th Cir. 2003). A failure to prove one essential element "necessarily renders all other facts immaterial." *Celotex,* 477 U.S. at 323.

The party seeking summary judgment on a claim on which the non-moving party bears the burden of proof at trial may discharge its burden by showing an absence of evidence to support the non-moving party's case. *Celotex,* 477 U.S. at 325. A plaintiff's self-serving statements, which are speculative or which lack a foundation of personal knowledge, and which are unsupported by specific concrete facts reflected in the record, cannot preclude summary

judgment. *Albiero v. City of Kankakee,* 246 F.3d 927, 933 (7th Cir. 2001); *Stagman v. Ryan,* 176 F.3d 986, 995 (7th Cir. 1999); *Slowiak v. Land O'Lakes, Inc.,* 987 F.2d 1293, 1295 (7th Cir. 1993).

The summary judgment standard is applied rigorously in employment discrimination cases, because intent and credibility are such critical issues and direct evidence is rarely available. *Seener v. Northcentral Technical Coll.,* 113 F.3d 750, 757 (7th Cir. 1997); *Wohl v. Spectrum Mfg., Inc.,* 94 F.3d 353, 354 (7th Cir. 1996). To that end, the court carefully reviews affidavits and depositions for circumstantial evidence which, if believed, would demonstrate discrimination. However, the Seventh Circuit has also made clear that employment discrimination cases are not governed by a separate set of rules, and thus remain amenable to disposition by summary judgment so long as there is no genuine dispute as to the material facts. *Giannopoulos v. Brach & Brock Confections, Inc.,* 109 F.3d 406, 410 (7th Cir. 1997).

In addition to the summary judgment standard just recited, Chism's claims must be analyzed pursuant to the evidentiary standards that apply to the types of discrimination claims she is making. Chism, of course, must be able to establish that there are at least genuine issues of material fact with regard to each of her claims in order for her to withstand Con-way's motion for summary judgment. The legal standards and elements of the claims Chism asserts in this lawsuit are well established and are set forth below.

### 1. Claims of Retaliation Under Title VII and § 1981 (Plaintiff's Counts 1 and 4).

Chism has asserted claims that Con-way retaliated against her in violation of Title VII and § 1981 as a result of her having filed a charge of discrimination. The Seventh Circuit recently summarized the long-standing law in this circuit concerning the method of proof for a

retaliation claim, stating as follows:

> A plaintiff can prove a retaliation claim under either the direct method of proof or the indirect method. *Tomanovich v. City of Indianapolis,* 457 F.3d 656, 662-63 (7th Cir. 2006). . . . Under the indirect method of proof, she must establish a *prima facie* case of retaliation by showing that: (1) she lodged a complaint about harassment;[1] (2) she suffered a materially adverse action; (3) she was meeting her employer's legitimate expectations; and (4) she was treated less favorably than similarly-situated employees who did not complain. *Rogers v. City of Chicago,* 320 F.3d 748, 754 (7th Cir. 2003). If [the plaintiff] can make out a *prima facie* case, the burden of production shifts to [the defendant] to provide a legitimate, nondiscriminatory reason for the adverse employment action. *Atanus v. Perry,* 520 F.3d 662, 677 (7th Cir. 2008). If [the defendant] succeeds, the burden then shifts again to [the plaintiff] to demonstrate that the proffered reason is a pretext, i.e., a lie. *Id.*

*Roby v. CWI, Inc.*, 2009 WL 2615973 *5 (7th Cir. Aug. 27, 2009). That court elaborated further

on retaliation claims, explaining that the method of proof for such claims is the same under Title

VII and § 1981. The court held as follows:

> Title VII forbids an employer from discriminating against an employee who has "opposed any practice" made unlawful by Title VII or who "has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under [Title VII]." 42 U.S.C. § 2000e-3(a). "The anti-retaliation provision seeks to prevent employer interference with 'unfettered access' to Title VII's remedial mechanisms . . . by prohibiting employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Burlington N. & Santa Fe Ry. Co. v. White,* 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting *Robinson v. Shell Oil Co.,* 519 U.S. 337, 346, 117 S.Ct. 843, 136 L.Ed.2d 808 (1997)). Similarly, the Supreme Court has determined that § 1981, which prohibits racial discrimination in making and enforcing contracts, encompasses retaliation claims. *See CBOCS West, Inc. v. Humphries,* --- U.S. ---, 128 S.Ct. 1951, 1954-55, 170 L.Ed.2d 864 (2008). We apply the same elements to retaliation claims under Title VII and § 1981, *Humphries v. CBOCS West, Inc.,* 474 F.3d 387, 403-04 (7th Cir. 2007), *aff'd,* --- U.S. ---, 128 S.Ct. 1951, 170 L.Ed.2d 864 (2008) [. . . ]

*Stephens v. Erickson*, 569 F.3d 779, 786 (7th Cir. 2009).

---

[1] Or, in this case, engaged in statutorily protected activity (by filing a claim of discrimination). *Stephens v. Erickson,* 569 F.3d 779, 786 (7th Cir. 2009).

**2. Claims Under the FMLA (Plaintiff's Count 2).**

Chism also alleges that Con-way violated her rights under the FMLA. The FMLA provides that employers must provide eligible employees with up to 12 weeks of unpaid leave from their job for, among other things, a "serious health condition" that makes the employee unable to perform the essential functions of her position. *Caskey v. Colgate-Palmolive Co.*, 535 F.3d 585, 590 (7th Cir. 2008) (internal citations omitted). The Act makes if unlawful for "any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by [the Act]." *Id.* In this case, Chism's claim under the FMLA alleges that Con-way violated the FMLA by interfering with her attempt to exercise her right to take leave under the Act to care for her ailing mother and by "imposing terms and conditions with respect to her use of FMLA leave that were different from and/or more onerous than those imposed on similarly-situated employees." Complaint, p. 6.

To prevail on her claim of interference with her FMLA rights, Chism must prove: 1) that she was an eligible employee under the Act; 2) that Con-way was a covered employer under the Act; 3) that she was entitled to leave under the Act; 4) that she provided Con-way with sufficient notice of her intent to take such leave; and 5) that Con-way denied her benefits to which she was entitled. *Id.* It is unlawful for an employer to interfere with an eligible employee's exercise of the rights enumerated in the FMLA. *Ridings v. Riverside Medical Center*, 537 F.3d 755, 761 (7th Cir. 2008). The language of the FMLA states as follows:

(a) Interference with rights
(1) Exercise of rights

It shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under this subchapter.

(2) Discrimination

It shall be unlawful for any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter.

29 U.S.C. § 2615(a).

Thus, the FMLA makes it unlawful for an employer to discharge or otherwise discriminate against an employee for exercising or attempting to exercise rights granted under the Act. 29 U.S.C. § 2615(a)(2).

**3. Claim of Race Discrimination Under 42 U.S.C. § 1981 (Plaintiff's Count 3).**

As noted, Chism has asserted a claim of race discrimination under § 1981. As the Seventh Circuit has observed, "[a]lthough section 1981 and Title VII differ in the types of discrimination they proscribe, the methods of proof and elements of the case are essentially identical." *Johnson v. City of Fort Wayne, Ind.,* 91 F.3d 922, 940 (7th Cir. 1996)." *McGowan v. Deere & Co.*, 2009 WL 2901931 *2 (7th Cir. Sept. 11, 2009). A plaintiff in either a Title VII or a § 1981 race discrimination claim can prove her case using either the direct method or the indirect, burden-shifting method. *Darchak v. City of Chicago Bd. of Educ.*, 2009 WL 2778227 * 5 (7th Cir. Sept. 3, 2009). The court in *Darchak* offered a detailed summary of the direct method of proof in a discrimination case:

Under the direct method of proof, a plaintiff's claim survives summary judgment if she can demonstrate "triable issues as to whether discrimination motivated the adverse employment action." *Nagle v. Vill. of Calumet Park,* 554 F.3d 1106, 1114 (7th Cir. 2009) (citation omitted). She can establish triable issues using either direct or circumstantial evidence. *Id.; see Atanus v. Perry,* 520 F.3d 662, 671 (7th Cir. 2008) ("The focus of the direct method of proof thus is not whether the evidence offered is 'direct' or 'circumstantial' but rather whether the evidence 'points directly' to a discriminatory reason for the employer's action.") (citation omitted). Direct evidence would be an admission by the decisionmaker that the adverse employment action was motivated by discriminatory animus. *Nagle,* 554

F.3d at 1114. Such admissions are understandably rare [. . . ] Circumstantial evidence of discrimination, however, is less rare. We typically point to three categories of circumstantial evidence in employment discrimination cases:

> (1) suspicious timing, ambiguous oral or written statements, or behavior toward or comments directed at other employees in the protected group; (2) evidence, whether or not rigorously statistical, that similarly situated employees outside the protected class received systematically better treatment; and (3) evidence that the employee was qualified for the job in question but was passed over in favor of a person outside the protected class and the employer's reason is a pretext for discrimination. *Sun v. Bd. of Trustees,* 473 F.3d 799, 812 (7th Cir. 2007) (citation omitted); *Troupe v. May Dep't Stores, Inc.,* 20 F.3d 734, 736 (7th Cir. 1994).

*Darchak*, 2009 WL 2778227 *5-6. A plaintiff who is not armed with direct evidence of alleged discrimination may establish her case using the long-established indirect, burden-shifting method. As the Seventh Circuit has explained:

> Under the indirect, burden-shifting approach of *McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973), [a plaintiff] . . . has to show that: (1) [s]he is a member of a protected class; (2) [s]he was qualified for the applicable positions;[2] (3) [s]he suffered an adverse employment action; and (4) similarly-situated persons not in the protected class were treated more favorably. *Fane v. Locke Reynolds, LLP,* 480 F.3d 534, 538 (7th Cir. 2007). If [a plaintiff] can make out a *prima facie* case on these four factors, the burden of production shifts to [the defendant] to offer a permissible, nondiscriminatory reason for the adverse employment action. *Id.* If it can do so, the burden then shifts back to [the plaintiff] to show that the stated reason is merely a pretext for discrimination, i.e., a lie. *Id.* The pretext analysis focuses on whether the reason was honest and not whether it was accurate or wise. *Barricks v. Eli Lilly & Co.,* 481 F.3d 556, 560 (7th Cir. 2007). Notwithstanding the shifting burdens, [the plaintiff] bears the ultimate burden of persuading the trier of fact that [the defendant] intentionally discriminated against [her] on the basis of [her] race. *Fane,* 480 F.3d at 538. *Id.*

*McGowan v. Deere & Co.*, 2009 WL 2901931 (7th Cir. Sept. 11, 2009).

Recently, in *Hobbs v. City of Chicago*, 573 F.3d 454, 462 (7th Cir. 2009), the

---

[2] Or, in this case, that she was meeting her employer's legitimate expectations in the performance of her job. *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 784-85 (7th Cir. 2007).

appellate court explained the legal concept of "pretext," explaining as follows:

> Our recent Title VII cases explain that a plaintiff demonstrates pretext by showing the employer's proffered nondiscriminatory reason is a lie and the real reason is based on discriminatory intent. *See, e.g., Fischer,* 519 F.3d at 403; *Brown v. Ill. Dep't of Natural Res.,* 499 F.3d 675, 683 (7th Cir. 2007); *Keri v. Bd. of Trs. of Purdue Univ.,* 458 F.3d 620, 646 (7th Cir. 2006) ("In a word, the Plaintiff must establish that ... [the employer's] reasons ... were merely made up to cover up ... discriminatory reasons.").

"The precise question then is not whether the employer's justification for the adverse action is a pretext, but whether it is 'a pretext for the sort of discrimination prohibited by [Title VII].' *McDonnell Douglas Corp.,* 411 U.S. at 804, 93 S.Ct. 1817; *see Reeves,* 530 U.S. at 147, 120 S.Ct. 2097 ("[I]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original))." *Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009).

In this case, Chism insists that she "can establish her discrimination and retaliation claims, as well as her FMLA claims, under both methods of proof." Plaintiff's Response, p. 11. Chism's direct proof lies in what she terms a "mosaic of circumstantial evidence." *Id*. She also maintains that she can establish a *prima facie* case for each of her claims under the indirect burden-shifting scheme.

## DISCUSSION

Con-way is a "'less-than-truckload' freight company engaged in the transportation of commodities in interstate commerce" and "has more than 290 facilities in the United States and Canada." Defendant's Brief, p. 2. The company employs over 18,000 people. *Id*. Throughout most of her tenure with Con-way, Chism worked as a

CSR in the company's front office, "and her primary duties included answering customer telephone calls, completing manifests, and tracking hazardous shipments." *Id*., pp. 2-3. When Chism was hired, she completed a "new hire orientation, during which she reviewed Con-way's policies and procedures . . . ." *Id*., p. 3. These policies and procedures include an "'Equal Employment Opportunity' policy and a 'No Sexual Harassment' policy. . . . Con-way also has an 'Open Door Policy' to assure all employees of their opportunity to discuss any work-related issue with supervisors and upper management." *Id*., p. 2.

According to Con-way, Chism took several periods of leave under the FMLA, all of which were approved by the company. *Id*., p. 3. These leave periods included the following:

1. February 3, 2004, through February 9, 2004 (citing Defendant's Exh. 13);
2. April 13, 2004, through April 19, 2004 (citing Defendant's Exh. 15);
3. May 21, 2004, through September 13, 2004 (citing Defendant's Exh. 14);
4. February 7, 2005, through February 14, 2005 (citing Defendant's Exh. 11 & 12);
5. August 31, 2006, through October 30, 2006 (citing Defendant's Exh. 9 & 10); and
6. February 28, 2007, through July 15, 2007 (citing Defendant's Exh. 6 & 7).

*Id*. Con-way insists that "[f]ollowing each of the above-listed FMLA leaves, Plaintiff returned to her former position at the same pay and benefits." *Id*. According to Con-way, "[p]laintiff admits that she 'doesn't know' if anyone at Con-way was biased against her for taking FMLA leave, nor had she ever heard anyone at Con-way say anything to cause her to believe they were biased against her for taking such leave." *Id*. (citing Motion for Summary Judgment, Attachment 2, Excerpts of Deposition of Kim Chism, p.

15) (hereinafter "Chism Dep, p. __")).[3]

Sometime in 2005 or 2006, Cushey, the XSB Manager, "assigned Plaintiff to perform CSR duties in the shop area." Defendant's Memorandum, p. 3. A man named Tom Bryner was, at the time, the lead mechanic in the shop. *Id.*, p. 4. According to Con-way, "[o]n November 2, 2006, Plaintiff sent an e-mail to Steven Perry, Field Maintenance Manager, stating he 'needed to have a talk with Tom Bryner about his attitude toward women." *Id.*, p. 4. Chism stated in that e-mail that she didn't "'know what his problem is . . . but if it is not addressed there will be problems here at the XMS shop.'" *Id.* (quoting Chism Dep., p. 34 and citing Defendant's Exhs. 29). Con-way presents evidence to prove it investigated Chism's complaint, substantiated some (but not all) of her concerns, and sent Chism a letter telling her that the company "had taken 'firm and severe action' against Bryner[.]," a fact which she conceded in her deposition. *Id.* (quoting Chism Dep., pp. 35-36 and Defendant's Exh. 30). "Con-way demoted Bryner from his lead position, and required him to apologize to Plaintiff (in the presence of Cushey) for anything he said that may have offended her." *Id.* (quoting Chism Dep., p. 36). Chism testified in her deposition that she accepted the apology and was satisfied with the result. *Id.*, pp. 36-37. Also, at her request, Chism was moved out of the shop area and back into the front office. Defendant's Memorandum, p. 4. Notwithstanding what Con-way characterizes as a satisfactory resolution of Chism's concerns, the

---

[3] The page numbers cited by the court in reference to the parties' respective briefs and exhibits are the page numbers assigned to those documents by the court's electronic docketing system, and may or may not coincide with the original page numbers placed thereon by the parties.

company states that she filed a charge of discrimination with the SBHRC and the EEOC alleging sex and race discrimination and retaliation based on the incident with Bryner. *Id*. Apparently, Chism "failed to timely pursue those claims." *Id*., p. 5 (citing Defendant's Exh. 1).

For several years while she was working at Con-way, Chism apparently made complaints to the company about various problems she believed existed and alleged that certain employees received favorable treatment. *Id*. According to Con-way, these complaints included the following:

1. In her June 2001 performance evaluation, Chism complained that "management did not recognize employees that go the extra mile unless they like them as a person." *Id*. (citing Chism Dep., pp. 16-17; Defendant's Exh. 18).

2. In January 2004, Chism sent an e-mail to a regional manager complaining that the company's management team was biased (although the e-mail stated nothing about this alleged bias being in any way racially based). *Id*. (citing Defendant's Exh. 19).

3. In January 2005, Chism complained to several members of Con-way management that "there was inconsistent treatment regarding attendance, accountability and assignment of work." *Id*. (citing Defendant's Exh. 21).

4. In January 2007, Chism complained to Juli Jones, Con-way's Manager of Personnel, "that Beth McGowen, Office Manager, was 'covering up' a certain employee's attendance. She also alleged that a coworker, as well as Cushey, called her a 'troublemaker.'" *Id*. (quoting Defendant's Exh. 36).

5. In May 2007, Chism complained during her performance review "that work was not distributed fairly in the office." *Id*. (citing Defendant's Exh. 39).

Con-way states that "[w]ith respect to each of the above-described complaints of favoritism, Plaintiff believed that Beth McGowan was showing favoritism towards Deborah Lewinski, CSR, with respect to attendance issues and work assignments." *Id*. (citing Chism Dep., p, 20). In her deposition, Chism testified that several other

14

employees, all of whom were Caucasian, shared her opinion that McGowan displayed favoritism towards Lewinski. *Id*. (citing Chism Dep., pp. 19, 41-42, and 44). Con-way also points out that in her deposition Chism "admits that she is unaware of any facts showing that the alleged favoritism shown by McGowan toward Lewinski was due to race." *Id*., pp. 5-6 (citing Chism Dep., p. 21). Con-way notes that Chism testified that she believed "that McGowan favored Lewinski because Lewinski 'needed a lot of encouragement,' Lewinski 'rented a house' from McGowan, and because they were 'personal friends.'" *Id*., p. 6 (citing Chism Dep., p. 21). Finally, Con-way states that it "investigated each and every one of Plaintiff's complaints and followed up with Plaintiff regarding the results. . . . Following each of these complaints, Plaintiff continued to be employed as a CSR and received the same wages and benefits she had received before making the complaints. . . . Moreover, Plaintiff does not recall receiving any discipline as a result of these complaints." *Id*. Also, it is undisputed that Chism never lodged any complaints with Con-way management about race discrimination or discrimination concerning FMLA leave.

Con-way claims that in several of Chism's annual performance reviews, she "was counseled repeatedly about refraining from gossip, hostile behavior, and poor customer service[.]" *Id*. Chism was warned about gossiping in the workplace and told to "cut down on office politics and refrain from gossiping and talking behind others [sic] backs." *Id*. (quoting Defendant's Exh. 24, 2002 Performance Review). She was also told in 2004 that she needed to improve her enthusiasm and "[a]nswer the phone in a positive upbeat manner that will be inviting." *Id*. (quoting Defendant's Exh. 26, 2004 Performance

Review).  In 2005 Chism was again warned about gossiping in the workplace and again told to try to be more enthusiastic and upbeat on the phone.  *Id.* (citing Defendant's Exh. 27, 2005 Performance Review).  Finally, in her 2007 Performance Review, Chism was again counseled about her "lack of enthusiasm when talking to customers on the phone." *Id.*, p. 7 (citing Defendant's Exh. 39).

Con-way also claims that it received "multiple" complaints about Chism from both customers and other employees.  *Id.*  These included complaints from customers that Chism was not friendly, not helpful, rude, and had bad phone etiquette.  *Id.*, pp. 7-8 (citing Defendant's Exhs. 25, 38, and 45).  These multiple complaints resulted in the "Letter of Instruction" Chism received, as stated previously.  As also stated above, Chism testified in her deposition that she had no reason to believe that these reports were false or were not received, or that they had anything to do with her race, her periods of FMLA leave or her prior EEOC charge.  *Id.*, p. 8 (citing Chism Dep., pp. 47-51 and 64).

In January 2007, Chism met with Cushey, McGowan and Jones.  *Id.*  The three members of management reiterated during that meeting that Chism "was not doing her job of answering the telephone and that other CSRs were intimidated by her because she had made comments behind their backs."  *Id.* (citing Chism Dep., pp, 43-45; Defendant's Exh. 34; and Defendant's Exhs. 22 and 23).

Then, in July 2007, Cushey met with Chism, "Erin Earl, CSR, and Danielle Ernsberger, CSR, individually. . . . During those meetings, Cushey explained to each of them that (1) he would not tolerate any further gossiping and/or talking about other CSRs behind their backs; (2) he would not tolerate any intimidating behavior toward other

CSRs; and (3) he would not tolerate any further derogatory and sarcastic remarks regarding Lewinski. . . . At that time, Cushey suspended Ernsberger and sent her home." *Id*., pp. 8-9. After this meeting, Chism allegedly "told Chris Scaff, Shop Supervisor, Veronica Gerver, Shop CSR, and Mark Schriscker, Mechanic, that it was her 'payday,' that Ernsberger had been escorted out to her car, that Cushey was screaming and hollering and that 'he was so hot if you touched him you would get burned.'" *Id*., p. 9 (quoting Chism Dep., pp. 55-57; Defendant's Exh. 46). Scaff then sent an e-mail to Cushey recounting what Chism had told him about the meeting. *Id*.

In August 2007, Pawelski (Con-way's Director of Human Resources for the company's Central Express operating unit) "visited the South Bend service center to meet with the CSRs to explain the importance of working together to provide excellent customer service to Con-way customers." Motion for Summary Judgment, Attachment 1, Pawelski Aff., ¶ 7. "Interviews conducted with several employees caused Pawelski to conclude that Plaintiff had been intimidating her co-workers." *Id*., ¶ 8. Con-way management personnel Pawelski and Cushey met with Chism to discuss these concerns. *Id*. During that meeting, Chism was told about "(1) the importance of working together as a team; (2) poor customer service would not be allowed; (3) disruptions in the workplace would not be tolerated by intimidating co-workers, undermining management and threats to move the service center manager out of his position; and (4) threats of lawsuits and paydays were disruptive to the workplace environment and would not be tolerated." *Id*., ¶ 9; Chism Dep., pp. 59-61; Defendant's Exh. 47. At this meeting, Chism "was advised that her actions of gossiping and provoking her co-workers were oftentimes

deemed intimidating by her co-workers." *Id*. Chism was then warned that "any further

incidents would lead to termination." *Id*. Chism admitted in her deposition that she

received this warning. Defendant's Brief, p. 10 (citing Defendant's Exh. 47).

Soon after this meeting, Pawelski states that he received reports from other

employees, including "Lewinski and Amy Kovacs, CSR, regarding Plaintiff's conduct."

*Id*. (citing Defendant's Exh. 48). According to Pawelski, Lewinski reported to him that

Chism approached her and "asked whether [another employee] was intimidated by

her[.]," to which Lewinski reportedly responded "that she did not think so." Chism

allegedly then responded that "'she must be,'" because "'that is what Greg Pawelski

said.'" *Id*., (quoting Pawelski Aff., ¶ 11). Kovacs allegedly told Pawelski that after his

meeting with Chism, Chism was "walking around the office, pointing to a 'big fake grin

on her face' and saying 'I'm smiling, is this a big enough smile? They told me to smile,

so that's what I'm doing.'" *Id*., ¶ 12. Pawelski asked Lewinski and Kovacs to

memorialize what they saw and heard by sending him e-mails concerning their

encounters with Chism. Defendant's Exh. 48. In addition, Pawelski states that he also

received an e-mail from Tony Williams, a Personnel Supervisor, who wrote to Pawelski

stating that employee Monica Vink had approached Williams "stating that she wanted to

resign due to the mistreatment she had received from Plaintiff." Defendant's Brief, p. 10

(citing Pawelski Aff., ¶ 13.

Con-way claims that "[o]n the basis of this information, Pawelski concluded that

Plaintiff had disregarded and mocked his instructions to her. . . . As a result, he

terminated Plaintiff's employment." *Id*., (citing Pawelski Aff., ¶ 14). Finally, Con-way

points out that Chism "did not appeal her termination to Con-way's internal employee termination review board." Defendant's Memorandum, p. 11. Chism admitted in her deposition that she did not appeal her termination. Chism Dep., pp. 65-66.

Chism responds to Con-way's recitation of the facts concerning her employment history first by stating that "she was the only African American Customer Service Representative . . . in Con-way's South Bend freight terminal (known in the company as 'XSB') . . . ." Plaintiff's Response, p. 1. Chism also alleges that "she had experienced not only disparate treatment, but racially inappropriate name-calling since she began to work for Con-way." *Id*.

The inappropriate name-calling to which Chism refers is a bit troublesome in more ways than one. First, she states in her deposition that a co-worker called her called her "the little black girl." Plaintiff's Exh. A, Chism Dep., p. 15. However, Chism's deposition testimony reveals that the comment, while obviously disturbing, may not be nearly (if at all) as relevant as it seems on its face. Chism testified on this point as follows:

> Q. During your employment at Con-way did you ever hear anyone at Con-way say anything about your race?
> A. Yes.
> Q. Who?
> A. Several people. I don't remember.
> Q. I need to know their names.
> A. Several employees mentioned my race.
> Q. Who?
> A. I'm not sure who. I don't remember.
> Q. Can you recall what they said?
> A. "The little black girl." No, I can't remember.
> Q. This is my one chance to ask you questions. Sitting here today, can you recall the names of anyone that said anything about your race during the time you were employed at Con-way? I just want the names to start with if you can recall.

A.  I don't recall the names.

*Id*.  So, while the alleged remark smacks of insensitivity, it is not much, if anything, in

the way of evidence.  As Con-way argues, it amounts to nothing more than an

unidentified employee, at an unidentified point in time, referring to Chism as "the little

black girl."  It is undisputed, however, that the comment was *not* made by Pawelski or

anyone else in a decision making capacity.

　　　Chism also claims that her first supervisor, Greg Roman, referred to her as

"'Sheniqua.' [He] would laugh it off when Chism asked him why, by saying it was

because she had 'an evil twin.'" Plaintiff's Response, p. 14 (citing Chism Dep., p. 11-13).

Chism also claims that "[o]ther employees, including Cushey, at times referred to Chism

as 'Sheniqua." *Id*.  Chism argues that "'Sheniqua' is, arguably, a uniquely African

American-sounding name.  Using it to identify Chism, especially when the name is

allegedly used because Chism has 'an evil twin,' allows a reasonable jury to conclude

that the nickname was intended to be an unflattering reference to Chism's race." *Id*., p.

17.  Chism admitted in her deposition that she asked Roman why he referred to her as

"Sheniqua" and that he responded, "It's a joke, Kim."  Chism Dep., p. 13.  Other than to

say that the name "Sheniqua" is "uniquely African American," Chism does not explain

how or why it would constitute "an unflattering reference to her race."[4]  Furthermore,

---

[4] The court conducted a internet search of the name "Sheniqua."  According to a website called "babyhold.com," which contains lists of African-American baby names, "Sheniqua" is, in fact, a girl's name and is of African-American origin.  It is, according to the website, a variation of the name "Shanika," which apparently means "God is gracious."  Another website, "thinkbabynames.com," explains that there are dozens of variations of female baby names beginning with the prefix "She," "Sha," and "Cha," and that they are variants of names of American, African, Arabian, Hindu, and Israeli origin.  The court was unable to locate any

Chism does not allege, nor is there any evidence in the record, that she ever complained to anyone in management about being called "the little black girl" or "Sheniqua." Certainly, there is no evidence whatsoever that Pawelski knew anything about these alleged incidents when he (and he alone) made the decision to terminate Chism, which is a crucially significant fact. *See, e.g., LaMontagne v. American Convenience Prod., Inc.*, 750 F.2d 1405, 1412 (7th Cir. 1984) (focus of inquiry for claim of discriminatory discharge is on the motivation of the individual or individuals who actually made the decision); *see also, Petts v. Rockledge Furniture, LLC*, 534 F.3d 715, 723 (7th Cir. 2008) ("[Plaintiff] could not offer any specifics as to when this comment was made, and thus, cannot show the necessary connection to the decision to terminate her employment."). Therefore, these isolated incidences of "name calling" are of no evidentiary support to Chism's claims of race discrimination under Title VII or § 1981. At best, these incidences reveal that Chism may have been the victim of one rude comment and/or puerile name-calling at the hands of certain co-workers whose senses of humor were fully developed in the eighth grade, but they do not support her claims that she was terminated because of her race.

Next, Chism refutes the accuracy of Con-way's allegations about her performance review notations and the complaints allegedly received from customers and employees. Plaintiff's Response, p. 2. For example, Con-way stated in its memorandum that

---

reference whatsoever that would indicate that the name "Sheniqua" was a negative reference to an African-American female or had any negative connotations attached to it. Be that as it may, the court will accept that Chism felt offended in some way when Roman or anyone else called her by that name. But again, apparently it did not offend her so much that she felt compelled to complain about it.

"Plaintiff was counseled repeatedly about refraining from gossip, hostile behavior, and poor customer service" during her job performance evaluations from 2002 to 2007. Defendant's Brief, p. 6. But Chism responds by stating that "[*n*]*one* of the cited Performance Reviews refers, either explicitly or implicitly to any 'hostile' behavior. . . . Moreover, none of the referenced Performance Reviews refers to 'poor customer service.' . . . The only reference to Chism's customer service refer to the need to 'work on projecting more enthusiasm in . . . answering the phone, a 'lack of enthusiasm' in her voice, and her 'monotone' expression." Plaintiff's Response, p. 2. Chism is technically correct, but she is splitting hairs. Con-way doesn't claim that the words "hostile behavior" *appear* in Chism's evaluations. The company only makes the point that Chism was counseled, repeatedly, for certain performance issues (and the record is replete with documentation to support this position). It is also true, as Chism alleges, that the phrase "poor customer service" does not appear in her evaluations. Nonetheless, she was, as Con-way points out, counseled many times about her lack of enthusiasm when talking to customers on the phone, which was part of her job, and evidence of this appears on several of her performance reviews.

Chism is not being completely forthright about the contents of her evaluations. While the words "hostile behavior" and "poor customer service" may not appear in those evaluations, other phrases critical of Chism's handling of co-workers and customers do appear. For example, in her 2004 evaluation, the following was noted:

> Work on projecting more enthusiasm in job tasks, i.e, answering the phone. Answer the phone in a positive upbeat manner that will be inviting. Customers hearing the lack of enthusiasm may interpret us [sic] not wanting their business. We want to invite our customers to call back.

Defendant's Exh. 26.  In Chism's 2005 evaluation, the following notation appeared:

> Fore [sic] the most part, Kim gets along with co-workers.  She needs to keep gossip to a minimum to prevent an abrasive atmosphere among other CSR's.  You are part owner in this company make sure you reflect the pride you feel when answering the phone.  Callers have commented on your lack of enthusiasm.  Work on being inviting to the caller.

Defendant's Exh. 27.  Finally, in her May 2007 evaluation, the following notations appeared:

Continue to improve on work relationships.  I am sure with continued efforts this will be corrected in the near future. . . . Work on becoming more upbeat when answering the phone.  I have received several calls commenting on your voice when you have answered.  Defendant's Exh. 39.

So, Chism is correct about the precise language used in her evaluations.  On the other hand, Con-way is correct when it claims that Chism was counseled repeatedly about her job performance as it related to her handling of telephone calls and her interaction with co-workers.  And these evaluations are only a few examples of the many documents Con-way has presented that memorialize the many times Chism was counseled for these and other problems or concerns about certain aspects of her work performance.

In another example of the sort of spin Chism tries to put on Con-way's factual recitation in an attempt to create a fact issue, Chism takes issue with Con-way's statement that "during the period of 2004 to 2007, Con-way received the following customer/employee complaints with respect to Plaintiff's conduct . . ," which appears in Defendant's Brief at pp. 7-8.  This is the statement that was followed by a list of those

complaints as set forth above.  Chism's retort is as follows:

> Describing Chism as having received the listed complaints "during the period of 2004 to 2007" is, at best, misleading.  In fact, the record is more appropriately described as showing two complaints in January 2004, and then *no* other complaints until *after* the [SBHRC] and the EEOC had both concluded the processing of Chism's Charge of Discrimination. . . . Moreover, after January 2004, Con-way identifies no complaints until after Chism applied for and was granted her longest intermittent FMLA leave.

Plaintiff's Response, p. 2.  Once again, Chism raises only a semantic argument at best. She is correct that several of the complaints Con-way mentions were received after the processing of her original discrimination charge and after her request for FMLA leave in 2007.[5]  Chism is attempting to discredit Con-way by implying that the company was not being completely honest in its recitation about the complaints it had received pertaining to her conduct.  But the court does not draw the same inference as Chism does from these alleged discrepancies in Con-way's recitation of the facts and cannot accept Chism's conclusion, which flies in the face of the evidence before the court.  Be that as it may, these are only two examples of Chism's many attempts to pigeonhole very minor (and even arguable) factual disputes into her claimed "mosaic" of circumstantial evidence. Anyway, the resolution of Con-way's motion for summary judgment turns on much more substantive factual and legal arguments.

Chism also takes issue with Con-way's statement that "[i]nterviews conducted with several employees caused Pawelski to conclude that Plaintiff had been intimidating her coworkers."  Defendant's Brief, p. 9.  Chism retorts by stating that "Con-way has

---

[5] It is not disputed, and Chism concedes in this statement, that her May 2007 request for FMLA to care for her ill mother was *granted,* not refused, by the company.  But more on this point later.

never identified any employee who says he/she was intimidated by Chism, nor has Con-way identified any specific examples of Chism's allegedly 'intimidating' behavior." Plaintiff's Response, p. 3. Yet again, Chism raises an issue that relates only to the wording used to summarize certain events, not an issue as to the substance of those events. Con-way points, for example, to an incident on August 1, 2007, in which another employee, Monica Vink, "was very upset and crying due to the inappropriate treatment she was receiving from co-worker Kim Chism." Defendant's Reply, p. 8 (citing Defendant's Exh. 48). Vink met with Tony Williams, the Personnel Supervisor, and relayed to him several examples of what she felt was unfair treatment she received from Chism. *Id*. The next day, Williams memorialized this meeting in a memo to Pawelski. Exh. 48. Williams listed the examples Vink had given him and noted in his memo that Vink "expressed that may be the best thing for her to do was too [sic] resigned [sic]." *Id*. Williams was able to persuade Vink not to resign and told her that Pawelski was coming to the XSB and that Vink would have "an opportunity to resolve this situation." *Id*. While it is true that Williams never expressly used the word "intimidation" in his memo, the fact that Con-way characterizes Chism's actions as such in its briefs does not raise a genuine issue of material fact concerning the company's ultimate decision to terminate Chism nor does it rise to the level of a credibility issue. In addition, Chism's inappropriate behavior toward her co-workers is documented in several of her performance evaluations and memorialized in numerous documents submitted by Con-way in support of its motion for summary judgment. *See, e.g.*, Defendant's Exhs. 22 and 23 (e-mail exchanges between Chism and co-workers criticizing other co-workers); Exh.

24 (2002 performance evaluation with notation for Chism to keep office gossip at a minimum); Exh. 25 (note to Chism's file written by office manager Beth McGowan regarding e-mails McGowan received from two of Chism's co-workers regarding Chism's attitude); Exh. 27 (2005 performance evaluation with notation for Chism to "keep gossip to a minimum to prevent an abrasive atmosphere); Exh. 39 (2007 performance evaluation with notation for Chism to "[c]ontinue to improve on work relationships."); Exh. 46 (e-mail from employee memorializing Chism's "ranting" in the workplace about "a large issue in the front office."); Exh. 47 (Pawelski's memo regarding August 2007 meeting with Chism, Pence and Cushey noting discussion with Chism that "[i]t is not acceptable to create disruptions in the work place.  By *intimidating* co-workers, undermining management, threatening to move the service center manager out of his position) (italics added); Exh. 48 (Williams's memo of August 2, 2007, *supra*, noting Vink's complaints that Chism would "say mean things to her," "glar[e] at her," "point at [her] for no reason[,]" and "speak negatively of [her] to other employees."); and *Id*., p. 4 (e-mail from Vink to Pawelski wherein Vink complains of a phone conversation by Chism that "had a threatening overtone which I feel is unacceptable behavior and it is this exact behavior that has made me very uncomfortable in this office for the past several months.").  In addition to all of this, Chism noted in her own handwritten notes from her meeting with Cushey and others on January 10, 2007, that Cushey told her "other CSR's are intimadated [sic] by me . . ." and that Cushey also told her she "needed to go home and think about why the other CSR's are intimadated [sic] by me." Defendant's Exh. 34.  So, Chism cannot allege that Con-way's concerns that she

intimidated co-workers now comes out of the blue simply because that specific word does not appear in her performance evaluations and/or written reprimands.

Next, Chism presents what she argues is evidence that similarly situated employees were treated more favorably than she. Plaintiff's Response, pp. 14-15. Chism claims, for example, that "there was a double standard that clearly indicated the management team was biased." *Id.*, p. 14. Chism claims that she "was issued a Letter of Instruction on May 15, 2007 for allegedly failing to call in two hours in advance of her starting time while on FMLA leave . . ." even though "other Con-way employees who took FMLA leave were not required to call in." *Id.*, pp. 14-15 (citing Plaintiff's Exh. D). Chism's cite to her Exh. D in support of this contention is rather curious. That exhibit is Con-way's written response to the EEOC's inquiry into Chism's allegations in her charge of discrimination. In that document, Con-way explains that Chism's failure to call in to report that she would not be at work was considered a violation of company policy since Chism had not yet been granted her FMLA leave and so she was considered absence without proper excuse on May 10, 2007. Exh. D, p. 2. It was on May 14 that Chism filled out the required FMLA paperwork and her leave request was approved. *See* Defendant's Exh. 6. The Letter of Instruction, which was indeed issued on May 15, 2007, concerned Chism's failure to call in to report her inability to work on May 10, several days *before* she applied for and was granted FMLA leave. Defendant's Exh. 6. That letter states, in relevant part, as follows:

> On Wednesday, May 9th, 2007, you contacted Office Manager, Beth McGowan, at 13:57 p.m. to inform her that you would not be in to work due to your Mother's illness. Your scheduled start time to report to work is 08:00 a.m. It is your responsibility to inform management as soon as you know that you're unable to

> work for your shift so that proper staffing arrangements can be ma[d]e–preferabl[y] 2 hours in advance.  Your failure to notify XSB management in advance resulted in additional planning and unnecessary last minute changes to meet the department's daily demands in a timely manner.
>
> . . .
>
> In the future, you need to give two (2) hours advance notice if you are unable to work your shift.

Defendant's Exh. 40.  The letter was issued, Con-way maintains, notwithstanding any FMLA request.  And again, while it was dated May 15, 2007, the letter of reprimand involves the incident on May 10, which was several days before Chism officially applied for and received her FMLA leave.  Intermittent leave or not, Chism was required by company policy and procedure to call a supervisor at Con-way to report that she would be unable to report to work on any particular day.  *Id.*

More importantly, Chism's Exhibit D, the Letter of Instruction, does not in any way support her claim that  "other Con-way employees who took FMLA leave were not required to call in."  In that document, Con-way lists several employees who were *not* required to call in to the office even though they could not work a particular shift. *Id.*, p. 2.  However, Con-way explains therein that all of the other employees to whom Chism refers had submitted "supporting medical documentation" and already had been granted leaves of absence for personal medical reasons.  *Id.*, pp. 2-3.  Therefore, they were not required to call in since Con-way was already aware that they would not be at work on specific dates.  Chism, on the other hand, failed to show up for her shift on May 10 and failed to call in until late that afternoon to report her absence.  *Id.*  Chism's situation, then, was markedly different from the other employees whom she claims

received more favorable treatment.

Chism also states in her brief that other Con-way CSRs were permitted "to change or modify their schedules frequently," but she was not permitted to do so. Plaintiff's Response, p. 15. In support of this contention, Chism cites her own deposition testimony. Plaintiff's Exh. A, p. 51. However, she also admitted in her deposition that she was, in fact, allowed to modify her schedule "[t]emporarily . . . for a couple weeks," but then that privilege was take away from her. *Id.* Neither in her deposition nor in her response brief does Chism specifically name other CSRs who allegedly received this preferential treatment. Con-way, however, in its response to the EEOC investigation, explained that its CSR employees bid on specific work hours each November, that Chism had specifically requested to begin work at 8:00 a.m., and that "Con-way Freight will, from time to time, allow employees to change their start time to accommodate a particular event (i.e., doctor's appointment, student-teacher conference, etc.)." Chism is unable to present any evidence that similarly situated CSRs were treated more favorably with respect to their work hours. The evidence establishes only that some employees were accommodated in this regard more readily than Chism due to their having obtained prior approval to adjust their schedules for specific reasons on specific occasions.

Chism also claims that several other Con-way employees received Letters of Instruction "for rude and/or otherwise unacceptable behavior toward Con-way's customers, but were not terminated." Plaintiff's Response, p. 15. She specifically refers to "LaTressa Williams, Tim Foist and Lisa Roehling." *Id.* (citing Plaintiff's Exhs. I, K, J and L (Letters of Instructions to Williams, Foist and Roehling). Chism maintains that

this also is evidence of preferential treatment. *Id*. Chism is correct on this point, but to a very limited extent. Each of the employees she names was issued a Letter of Instruction for rude or otherwise unacceptable behavior toward customers. In Williams's Letter of Instruction, she was warned that any further complaints about her from customers "will result in further discipline up to and most likely including termination of employment." Plaintiff's Exh. I. Foist's Letter of Instruction warned him that any further complaints "may result in further disciplinary action, up to and including termination from employment." Plaintiff's Exh. K. Foist was then issued a second Letter of Instruction several months after his first, in which he was warned that any future complaint against him "will lead to further disciplinary action up to and <u>more than likely</u> termination of your employment." Plaintiff's Exh. J (emphasis in original). Roehling's Letter of Instruction likewise warned her that her "future employment depends" on her correcting her "attitude and handling of the customer service issues on the phone." Plaintiff's Exh. L. Thus, each of these employees was issued a Letter of Instruction after an incident during which they were rude or otherwise discourteous in handling inquiries from Con-way customers and were warned, in various degrees of severity, of the consequences of any further such behavior. What Chism avoids mentioning is that in her case, even though it is supported by the evidence as set forth above, Con-way received multiple complaints about her from customers, not just one or two. Defendant's Exh. 45 (Letter of Instruction, June 15, 2007). Furthermore, while Chism states that neither Williams nor Foist nor Roehling were terminated as a result of their rude behavior toward customers, she fails to present any evidence that her own termination was a direct result of such

behavior.  Con-way adamantly maintains that Chism was terminated because of Pawelski's belief that she had been insubordinate, not because she was rude to customers. And, in fact, Chism was *not* terminated after receiving her Letter of Instruction on May 15, 2007, or her Letter of Instruction on June 15, 2007, even though the second letter warned her that her failure to correct her behavior and attitude when dealing with customers "will result in further disciplinary action up to, and more than likely, termination of your employment."  Defendant's Exhs. 40 and 45.  Thus, Chism received the same sort of Letter of Instruction, with a similar warning, as was issued to Williams, Foist and Roehling.  This is true even though Chism's Letter of Instruction on June 15, 2007, listed not just one, but several, instances of her alleged rude and/or discourteous conduct.

Next, Chism claims that she "was meeting Con-way's legitimate expectations" since her annual appraisals from 2002 to 2007 do not mention "hostile behavior or poor customer performance, either explicitly or implicitly."  Plaintiff's Response, p. 16 (citing Plaintiff's Exhs. B24, B26, B27, and B39).  This issue has already been discussed above and the court noted that while the words "hostile behavior" and "poor customer service" may not appear verbatim in Chism's performance reviews, those reviews make it clear that her overall behavior in the workplace and her handling of customer service at least on several occasions fell below Con-way's expectations.  Chism was counseled in meetings and in her Letters of Instruction about her inappropriate behavior toward co-workers and customers.  The many e-mails from customers and co-workers, and the notes and reports prepared by Pawelski, all pertaining to Chism, corroborate Con-way's

position that Chism was not meeting the company's legitimate expectations at all times, and certainly not on the day Pawelski fired her. This is true even though Chism's annual reviews state, or at least imply, that she performed her job satisfactorily the majority of the time.

Chism also argues that she has presented evidence of "suspicious timing" regarding her termination, which she claims supports her claims of discrimination. Plaintiff's Response, p. 12. This "suspicious timing" includes the following facts:

1. The first two complaints against Chism from customers claiming she was rude occurred in 2004, after which "there is a gap of more than three years until another complaint is recorded–coincidentally, in April 2007, barely one month after the SBHRC referred Chism's discrimination charge to the EEOC for final review." *Id.*

2. "Chism left work early on May 8 to care for her mother. . . . She called her supervisor, McGowan, the following day to advise her that she would return once doctors had stabilized her mother, probably on Monday, May 14. . . . [On May 15 Chism] was given her first ever Letter of Instruction . . . for failing to call in at least two hours prior to the start of her shift." *Id.*, pp. 12-13.

3. Chism received her second Letter of Instruction "[o]n June 15, *the day after* the EEOC issued Chism's Notice of Right to Sue on her discrimination claim[.]" *Id.*, p. 13.

4. On July 26, 2007, Chism had her meeting with Cushey and others to discuss problems in the workplace.

5. On August 2, 2007, Chism "was required to meet with HR Director Greg Pawelski[.]" to discuss Chism's alleged problems in the workplace. *Id.*, pp. 13-14.

Chism implies that this is evidence Con-way was conspiring to get rid of her shortly after her charge of discrimination was moving through the administrative process. Her argument is that these facts are part of her "mosaic" of circumstantial evidence proving discrimination (or at least raising a fact issue about it).

Chism is correct that there was a gap of several years between the first complaints Con-way received about her job performance and the later ones, which indeed were lodged around the time her charge of discrimination was making its way through the SBHRC and the EEOC. But her conclusion that this constitutes evidence of discrimination flies in the face of the overwhelming paper trail of evidence Con-way has presented documenting Chism's problems with her job performance. And, even if a jury were to conclude that the timing of Chism's firing was suspicious in light of the 2007 complaints against her and the subsequent Letters of Instruction she received in the months just prior to her termination, that fact issue would not be enough to save the day for Chism on her claims. *Hobbs v. City of Chicago*, 573 F.3d 454, 464 (7th Cir. 2009) ("suspicious timing alone is generally insufficient to establish a genuine issue of material fact for trial."); *Easley v. YMCA of Metropolitan*, 2009 WL 1803290 * 4 (7th Cir. June 25, 2009) (where the only direct evidence of retaliation was the timing of [plaintiff's] termination, that suspicious timing alone is insufficient proof); *see also*, *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) ("'mere temporal proximity [between acts of employee and employee's termination] is not enough to establish a genuine issue of material fact.'") (quoting *Andonissamy v. Hewlett-Packard Co.*, 547 F.3d 841, 851 (7th Cir. 2008)). Just as importantly, it is crucial to keep in mind that ultimately, Chism was not fired because of customer or co-worker complaints. She was fired when Pawelski got wind of what he considered her insubordinate behavior just after he met with her and counseled her on what was expected of her. *See, e.g., Rhodes v. Professional*

*Transportation, Inc.*, 3 Fed.Appx. 515 (7th Cir. 2001).[6]

Finally, Chism argues that her "mosaic" of circumstantial evidence supports her contention that Con-way's alleged reason for firing her was pretext for discrimination. Plaintiff's Brief, pp. 16-17. As set forth above, "pretext" means "a lie and the real reason [for termination] is based on discriminatory intent. *See, e.g., Fischer,* 519 F.3d at 403; *see Reeves,* 530 U.S. at 147 ("[I]t is not enough ... to *dis*believe the employer; the factfinder must *believe* the plaintiff's explanation of intentional discrimination." (quoting *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 519, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)) (emphasis in original))." *Greene v. Potter*, 557 F.3d 765, 769 (7th Cir. 2009). As Con-way points out, "[i]t [is] Plaintiff's burden to prove pretext, which means that Plaintiff must 'identify such weaknesses, implausibilities, inconsistencies, or contradictions in the purported reasons that a jury could find them unworthy of credence.'" Defendant's Reply, p. 7 (quoting *Fane v. Locke Reynolds, LLP*, 480 F.3d 534, 541 (7th Cir. 2007)). Con-way goes on to argue that Chism's "unsupported beliefs, speculation and tenuous inferences have failed to meet this burden." *Id.* (citing *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006)) (plaintiff's conclusory statements do not create an issue of fact for trial). *See also Sanchez v. Henderson*, 188 F.3d 740, 746 (7th Cir. 1999) (plaintiff's belief that employer's decision was motivated by

---

[6] In this unpublished opinion, the Seventh Circuit held that despite Ms. Rhodes's evidence of retaliatory discharge, including but not limited to the suspicious timing of her termination, she failed to rebut her employer's proffered reason for her termination, which was based on her work performance interfering with customer relationships even though other aspects of her performance were satisfactory, and her continued inappropriate behavior in defiance of her employer's instruction that she cease engaging in such behavior. 3 Fed.Appx. 515 *3.

discriminatory intent was insufficient to survive motion for summary judgment).

In summary, Chism claims that her "mosaic" of circumstantial evidence serves to establish *prima facie* claims of discrimination and retaliation "under the direct and indirect methods of proof." Plaintiff's Response, p. 17. But Chism's "mosaic" is actually nothing more than a few immaterial fact issues coupled with speculation and conclusion on her part. Chism's "evidence" of race discrimination comes down to the facts that one unidentified co-worker referred to her as "the little black girl" and Cushey and perhaps some other co-workers on occasion called her "Sheniqua." But Chism points to absolutely nothing in record to indicate that she ever notified anyone in management about these incidents when they occurred, nor does she present an iota of evidence that they played any part in Pawelski's decision to terminate her employment (or, for that matter, that he even knew about them). Chism's complaint that she was discriminated against because she took her longest period of FMLA leave a few months before her termination is likewise unsupported by the evidence.[7] It is undisputed that during the course of her employment with Con-way, Chism requested, and was granted, several FMLA leaves of absence. It is also undisputed that her request for intermittent FMLA leave in May of 2007 was also granted. It was almost three months later that Pawelski made the decision to fire Chism based on what he perceived as insubordinate behavior. Her termination did not come on the heels of either the issuance of her Notice

---

[7] Con-way points out the fact, which is supported by the documentary evidence, that Chism's longest period of FMLA leave actually "occurred in 2004 when she was out for approximately four months between May 21 and September 13, 2004." Defendant's Reply, p. 2, n. 3 (citing Defendant's Exh. 14–FMLA paperwork). Chism's May 2007 FMLA request, "which Con-way granted, was taken on an intermittent basis." *Id*.

of Right to Sue letter from the EEOC or the approval of her FMLA leave.  Chism attempts to raise material fact issues in the face of overwhelming evidence that her firing had absolutely nothing to do with race discrimination, interference with her FMLA rights, or retaliation for her having filed a charge of discrimination or taken FMLA leave. Even if all reasonable (an even some not so reasonable) inferences are drawn in favor of Chism, she cannot escape the fact that Pawelski decided to fire her because he had simply had enough and was not going to tolerate her insubordination in the form of mocking his directives to her about her workplace demeanor and attitude.  Employers are, of course, perfectly free to fire an at-will employee whom the employer believes is a disgruntled troublemaker who reflects a poor image to the company's customers and who contributes to an unpleasant atmosphere in the workplace.

It is glaringly obvious from a preponderance of the evidence that Chism was ultimately terminated because Pawelski had received so many complaints about her from customers and co-workers and because he learned of Chism's insubordinate conduct after meeting with him on August 2, 2007, when he told her that no further misconduct would be tolerated.  The evidence demonstrates that the only fact issue in this case is whether Pawelski's decision to terminate Chism was hasty or made out of anger.  But the answer to that fact question is of no moment, since the sole inquiry is whether the reason for Pawelski's decision was pretextual, not whether it was right or wrong.  It is not the job of this court to "act as a super personnel department that second guesses employers' business judgments[.]" as the Seventh Circuit has noted repeatedly over the years.  *See Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009).  And, as stated previously in this

Opinion, "pretext . . . focuses on whether the reason [for termination] was honest and not whether it was accurate or wise." *Barricks*, 481 F.3d at 560. In this case, Chism is claiming that Pawelski's decision was based on her race, the fact that she took FMLA leave, and in retaliation for exercising her rights under Title VII and the FMLA. But for all of the reasons set forth in detail in this Opinion, Chism has failed to produce evidence that her race or her request for FMLA leave played any part in the decision to terminate her. As Con-way states:

> Plaintiff was a disgruntled, unhappy Con-way employee. Con-way's attempts to hold Plaintiff accountable for her actions and behavior were met with resistance and opposition. Plaintiff continued to develop an atmosphere of hostility and unfriendliness toward both co-workers and customers. Plaintiff was afforded every opportunity to correct her behavior to no avail. As a consequence, Con-way properly terminated her employment.

Defendant's Brief, p. 23. This summation of the situation is concise, accurate, and supported by the evidence. Even when all reasonable inferences are interpreted in favor of Chism, she fails to present sufficient evidence that the decision to terminated her was based in any way on her race or the fact that she took FMLA leave.

Chism's claimed "mosaic" of circumstantial evidence fails to raise a genuine issue of material fact for trial on any of her claims. In order to survive summary judgment by using circumstantial evidence, a plaintiff must "'construct[] a convincing mosaic of circumstantial evidence that allows a jury to infer intentional discrimination by the decisionmaker.'" *Daugherty v. Wabash Center, Inc.*, 2009 WL 2477640 * 3 (7th Cir. Aug. 14, 2009) (citations omitted). In this case, Chism's "mosaic" is nothing more than a hodgepodge of unrelated events to which she assigns great importance, coupled with her own conclusions about what those events meant. Furthermore, even if all reasonable

inferences from those events are construed in her favor, Chism's "mosaic of circumstantial evidence" fails to prove (or even raise a genuine issue of fact concerning) "intentional discrimination *by the decisionmaker*," since she fails to tie her circumstantial evidence to Pawelski's decision to terminate her. Chism also fails to establish any of her claims under the indirect, burden-shifting approach, since she cannot establish that she was meeting her employer's legitimate expectations as far as her job performance. While her overall performance, according to her annual performance evaluations, was apparently acceptable, there were obviously aspects of her performance that were *not* acceptable, which is why she was repeatedly counseled and issued Letters of Instruction. Most importantly, however, is the fact that she was not meeting her employer's expectations at all when she mocked and ignored Pawelski's directives and was fired for what Pawelski deemed to be insubordination. That fact renders moot the fact that she generally performed adequately during most of her tenure at Con-way.

In summary, Chism's claims, and the evidence she purports to have to support them, are as follows:

1. Retaliation under Title VII for having filed a charge of discrimination on November 20, 2006, and having been fired on August 3, 2007. Chism's only evidence to support this allegation is that her termination came nine months after she filed her charge and five months after that charge was referred by the SBHRC to the EEOC for "final processing." Chism also claims that in the interim, she was treated unfairly when Con-way issued her Letters of Instruction and counseled her for instances of poor job performance. This fails to establish the sort of "nexus" between the filing of her charge

and her termination so as to raise a fact issue concerning retaliation. The mere fact that Chism filed a charge of discrimination prior to the date of her termination does not alone establish causation to support a retaliation claim. *Mullin v. Gettinger*, 450 F.3d 280, 285 (7th Cir. 2006). Also any "inference of causation weakens as the time between the protected expression and the adverse action increases thus requiring additional proof of a causal nexus." *Id*. (citing *Oest v. Illinois Dept. of Corr.*, 240 F.3d 605, 616 (7th Cir. 2001)). Chism fails to establish any such nexus and, to the extent it could even be argued that any nexus existed, it was negated by Chism's own insubordination after her August 2, 2007, meeting with Pawelski. *Rhodes v. Professional Transp., Inc.*, 3 Fed.Appx. 515 (7th Cir. 2001).

2.  FMLA claim that Con-way interfered with her rights under the Act and somehow restrained her ability to take leave under the Act. But the evidence clearly demonstrates that Chism was granted FMLA leave on several occasions, was never denied such leave, was granted intermittent leave to care for her mother, and was not treated differently from other employees simply because she was reprimanded for not calling in to work when she was absence one day in May 2007 and not permitted to adjust her work hours while she was on that intermittent leave. But her reprimand and the denial of her request to adjust her hours did not prevent her from taking FMLA leave. Chism fails to point to any tangible loss of her FMLA rights as a result of the discipline she received and "[t]he FMLA does not protect against a violation that has no recoverable damage or equitable remedy." *Lakes v. Colgate-Palmolive Co.*, 2008 WL 833241 (S.D. Ind. March 27, 2008).

3.  Race discrimination under 42 U.S.C. § 1981, which Chism claims is supported only by the fact that an unidentified co-worker called her "the little black girl" on one occasion even though she could not remember when and never reported the incident, and other co-workers referred to her as "Sheniqua," which she interpreted, for reasons she does not spell out, as a negative reference to her race.

4.  Retaliation claim under § 1981, which fails for the same reasons her Title VII retaliation claim fails.

## CONCLUSION

For the reasons set forth in this opinion and order, the motion for summary judgment filed by the defendant, Con-way Freight, Inc., is GRANTED as to all of plaintiff's claims.

Date: September 24 , 2009.

       /s/   William C. Lee
            William C. Lee, Judge
            United States District Court
            Northern District of Indiana